(Slip Opinion)  OCTOBER TERM, 2011  1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SMITH *v.* CAIN, WARDEN

### CERTIORARI TO THE CRIMINAL DISTRICT COURT OF LOUISIANA, ORLEANS PARISH

No. 10–8145.   Argued November 8, 2011—Decided January 10, 2012

Petitioner Juan Smith was convicted of first-degree murder based on
the testimony of a single eyewitness.  During state postconviction re-
lief proceedings, Smith obtained police files containing statements by
the eyewitness contradicting his testimony.  Smith argued that the
prosecution's failure to disclose those statements violated *Brady* v.
*Maryland*, 373 U. S. 83.  *Brady* held that due process bars a State
from withholding evidence that is favorable to the defense and mate-
rial to the defendant's guilt or punishment.  See *id.*, at 87.  The state
trial court rejected Smith's *Brady* claim, and the Louisiana Court of
Appeal and Louisiana Supreme Court denied review.

*Held: Brady* requires that Smith's conviction be reversed. The State
does not dispute that the eyewitness's statements were favorable to
Smith and that those statements were not disclosed to Smith.  Under
*Brady,* evidence is material if there is a "reasonable probability that,
had the evidence been disclosed, the result of the proceeding would
have been different." *Cone* v. *Bell*, 556 U. S. 449, 469–470.  A "rea-
sonable probability" means that the likelihood of a different result is
great enough to "undermine[ ] confidence in the outcome of the trial."
*Kyles* v. *Whitley*, 514 U. S. 419, 434.  Evidence impeaching an eye-
witness's testimony may not be material if the State's other evidence
is strong enough to sustain confidence in the verdict. *United States* v.
*Agurs*, 427 U. S. 97, 112–113, and n. 21.  Here, however, the eyewit-
ness's testimony was the *only* evidence linking Smith to the crime,
and the eyewitness's undisclosed statements contradicted his testi-
mony.  The eyewitness's statements were plainly material, and the
State's failure to disclose those statements to the defense thus violat-
ed *Brady*.  Pp. 2–4.

Syllabus

Reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 10–8145

———

## JUAN SMITH, PETITIONER *v.* BURL CAIN, WARDEN

ON WRIT OF CERTIORARI TO THE ORLEANS PARISH CRIMINAL DISTRICT COURT OF LOUISIANA

[January 10, 2012]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The State of Louisiana charged petitioner Juan Smith with killing five people during an armed robbery. At Smith's trial a single witness, Larry Boatner, linked Smith to the crime. Boatner testified that he was socializing at a friend's house when Smith and two other gunmen entered the home, demanded money and drugs, and shortly thereafter began shooting, resulting in the death of five of Boatner's friends. In court Boatner identified Smith as the first gunman to come through the door. He claimed that he had been face to face with Smith during the initial moments of the robbery. No other witnesses and no physical evidence implicated Smith in the crime.

The jury convicted Smith of five counts of first-degree murder. The Louisiana Court of Appeal affirmed Smith's conviction. *State* v. *Smith*, 797 So. 2d 193 (2001). The Louisiana Supreme Court denied review, as did this Court. 2001–2416 (La. 9/13/02), 824 So. 2d 1189; 537 U. S. 1201 (2003).

Smith then sought postconviction relief in the state courts. As part of his effort, Smith obtained files from the

police investigation of his case, including those of the lead investigator, Detective John Ronquillo. Ronquillo's notes contain statements by Boatner that conflict with his testimony identifying Smith as a perpetrator. The notes from the night of the murder state that Boatner "could not . . . supply a description of the perpetrators other then [*sic*] they were black males." App. 252–253. Ronquillo also made a handwritten account of a conversation he had with Boatner five days after the crime, in which Boatner said he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." *Id*., at 308. And Ronquillo's typewritten report of that conversation states that Boatner told Ronquillo he "could not identify any of the perpetrators of the murder." *Id*., at 259–260.

Smith requested that his conviction be vacated, arguing, *inter alia*, that the prosecution's failure to disclose Ronquillo's notes violated this Court's decision in *Brady* v. *Maryland*, 373 U. S. 83 (1963). The state trial court rejected Smith's *Brady* claim, and the Louisiana Court of Appeal and Louisiana Supreme Court denied review. We granted certiorari, 564 U. S. ___ (2011), and now reverse.

Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. See 373 U. S., at 87. The State does not dispute that Boatner's statements in Ronquillo's notes were favorable to Smith and that those statements were not disclosed to him. The sole question before us is thus whether Boatner's statements were material to the determination of Smith's guilt. We have explained that "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone* v. *Bell*, 556 U. S. 449, 469–470 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different

verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[] confidence in the outcome of the trial." *Kyles* v. *Whitley*, 514 U. S. 419, 434 (1995) (internal quotation marks omitted).

We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. See *United States* v. *Agurs*, 427 U. S. 97, 112–113, and n. 21 (1976). That is not the case here. Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony: Boatner told the jury that he had "[n]o doubt" that Smith was the gunman he stood "face to face" with on the night of the crime, but Ronquillo's notes show Boatner saying that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." App. 196, 200, 308. Boatner's undisclosed statements were plainly material.

The State and the dissent advance various reasons why the jury might have discounted Boatner's undisclosed statements. They stress, for example, that Boatner made other remarks on the night of the murder indicating that he could identify the first gunman to enter the house, but not the others. That merely leaves us to speculate about which of Boatner's contradictory declarations the jury would have believed. The State also contends that Boatner's statements made five days after the crime can be explained by fear of retaliation. Smith responds that the record contains no evidence of any such fear. Again, the State's argument offers a reason that the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so.

The police files that Smith obtained in state postconviction proceedings contain other evidence that Smith contends is both favorable to him and material to the verdict. Because we hold that Boatner's undisclosed statements

alone suffice to undermine confidence in Smith's conviction, we have no need to consider his arguments that the other undisclosed evidence also requires reversal under *Brady*.

The judgment of the Orleans Parish Criminal District Court of Louisiana is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8145

_____

## JUAN SMITH, PETITIONER *v.* BURL CAIN, WARDEN

ON WRIT OF CERTIORARI TO THE ORLEANS PARISH CRIMINAL
DISTRICT COURT OF LOUISIANA

[January 10, 2012]

JUSTICE THOMAS, dissenting.

The Court holds that Juan Smith is entitled to a new murder trial because the State, in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963), did not disclose that the eyewitness who identified Smith at trial stated shortly after the murders that he could not identify any of the perpetrators. I respectfully dissent. In my view, Smith has not shown a "reasonable probability" that the jury would have been persuaded by the undisclosed evidence. *United States* v. *Bagley*, 473 U. S. 667, 682 (1985) (opinion of Blackmun, J.). That materiality determination must be made "in the context of the entire record," *United States* v. *Agurs*, 427 U. S. 97, 112 (1976), and "turns on the cumulative effect of all such evidence suppressed by the government," *Kyles* v. *Whitley*, 514 U. S. 419, 421 (1995). Applying these principles, I would affirm the judgment of the Louisiana trial court.

### I

The evidence presented at trial showed the following facts. On March 1, 1995, Larry Boatner and several friends gathered at Rebe Espadron's home in New Orleans. Boatner and others were drinking and talking in the kitchen when Boatner heard the loud sound of a car without a muffler outside. As Boatner opened the kitchen's outside door to investigate the noise, armed men pushed

their way through the door, demanding drugs and money. Tr. 153–154 (Dec. 5, 1995). The first man though the door put a gun in Boatner's face and pushed him backwards. *Id.,* at 154–155. The men initially ordered Boatner and his friends to the floor, but then ordered Boatner to stand up. At that time, the man who had been the first one through the door placed his gun under Boatner's chin. *Id.,* at 156–157. When Boatner asked what the men wanted him to do, the first man struck Boatner on the back of the head with his gun, knocking Boatner back to the ground. *Id.,* at 157–158.

After hearing the commotion, Espadron emerged from a back bedroom, where she had been when the men entered the house. As Espadron opened an inside door leading to the kitchen, a man with a "covering" over his mouth pointed his gun at her face and ordered her to the floor. *Id.,* at 70–71. Disregarding his command, Espadron ran back toward the bedroom, at which point the intruders opened fire. *Id.,* at 71–72, 159.

When the shooting was over, four people lay dead. A fifth person, 17-year-old Shelita Russell, was mortally wounded and died later at the hospital. Of those originally gathered in the house, the only survivors were Boatner, who suffered a severe laceration to his head from the first man's blow but was otherwise uninjured; Espadron, who escaped unharmed; and Reginald Harbor, who had remained in a back bedroom during the shooting. The police also found a man named Phillip Young at the scene. Young was alive but had suffered a gunshot wound to the head. Because Boatner, Espadron, and Harbor had never seen Young before, the police surmised that Young had been one of the perpetrators.[1]

———————

[1] Young was indicted along with Smith for the murders, but he was deemed incompetent to stand trial due to the brain damage he suffered

New Orleans police officer Joseph Narcisse was a first responder to the scene of the shooting. He testified at trial that he encountered Boatner in the bathroom of Espadron's home, where Boatner was attempting to care for the laceration to his head. According to Narcisse, "Mr. Boatner . . . had let inside the perpetrators and did see them." *Id.,* at 21 (Dec. 4, 1995). Narcisse further explained that Boatner "had a description" of the person that he saw, the details of which Narcisse could not recall. *Id.,* at 32.

Detective John Ronquillo, the lead investigator of the shootings, testified that Boatner had described the first man through the kitchen door as having a "short-type haircut," "a lot of golds in his teeth," and "brown-ski[n]."[2] *Id.,* at 115 (Dec. 5, 1995). Ronquillo further testified that Boatner could describe no other perpetrator, but that Boatner had viewed the first man twice: once when the man initially came through the door and again when Boatner was ordered to stand up and the man held a gun to his chin. *Id.,* at 117–118.

Ronquillo also testified that, during the four months following the shootings, Boatner viewed 14 six-person photograph arrays of potential suspects—only one of which contained a picture of Smith. *Id.,* at 89–100. Three weeks after the crime, Ronquillo presented Boatner with one of the arrays that did not include a picture of Smith. Ronquillo recalled that Boatner noted that one man in the array had a "similar haircut" and "a similar expression on his face" as the "gentleman that came into the house initially with the gun that [Boatner] confronted," but that

_____

as a result of being shot. 1 Record 49.

[2] "Golds" are permanent or removable mouth jewelry, also referred to as "grills." See Mouth Jewelry Wearers Love Gleam of the Grill, South Florida Sun-Sentinel, Feb. 4, 2007, p. 5, 2007 WLNR 2187080. See also A. Westbrook, Hip Hoptionary 59 (2002) (defining a "grill" as a "teeth cover, usually made of gold and diamonds").

Boatner "was positive this wasn't the individual." *Id.,* at 97; see also 5 Record 828. A few months later, Ronquillo presented Boatner with the array that included a photograph of Smith. Tr. 99–101 (Dec. 5, 1995). Ronquillo testified that Boatner identified Smith "immediately," stating, "'This is it. I'll never forget that face.'" *Id.,* at 100. Of the 84 photographs that Boatner viewed, Smith's photograph was the only one that Boatner identified.

Boatner identified Smith again when he was called to the stand during Smith's trial. Boatner testified that Smith's face was the "[s]ame face," *id.*, at 174, and that Smith's mouth was the "[s]ame mouth" "full of gold," *ibid.,* as that of the first man who came through the kitchen door on the night of the attack. Boatner also testified that Smith's hair at trial was "shaved on the sides" as it was during the crime, but that "the top was a little bit lower" at the time of the murders. *Id.,* at 165. Boatner explained that, during the attack, he had focused on the first man through the door—who was unmasked—but that he "didn't notice" the faces of any of the other assailants or whether they were masked. *Id.,* at 154. On cross-examination, Boatner testified that he had described the first man's build, haircut, and gold teeth jewelry to the police. *Id.,* at 178.

Based on this evidence, the jury convicted Smith of first-degree murder. Following the conclusion of direct review, Smith petitioned the trial court for postconviction relief. Smith argued that the State had failed to disclose various police notes revealing favorable evidence material to Smith's guilt. As relevant here, those items include pretrial statements by Boatner; statements by victim Shelita Russell and Espadron's neighbor, Dale Mims; a pretrial statement by firearms examiner Kenneth Leary; statements by cosuspect Robert Trackling and Trackling's fellow inmate, Eric Rogers; and a statement by cosuspect Phillip Young. After holding a 4-day evidentiary hearing,

the postconviction judge—who had also presided over Smith's 2-day trial—denied Smith's *Brady* claims.

Like the postconviction court below, I conclude that Smith is not entitled to a new trial under *Brady*. In my view, Smith has not established a reasonable probability that the cumulative effect of this evidence would have caused the jury to change its verdict.

## II

### A

Smith first identifies two undisclosed statements by Boatner, which the Court concludes are "plainly material." *Ante,* at 3. First, a note by Ronquillo, documenting a conversation he had with Boatner at the scene, states that Boatner "could not . . . supply a description of the perpetrators other th[a]n they were black males." 5 Record 809. Second, a handwritten note by Ronquillo, documenting a phone conversation he had with Boatner on March 6, five days after the murders, states that "Boatner . . . could not ID anyone because couldn't see faces . . . glanced at 1st one—saw man—through door—can't tell if had—faces covered didn't see anyone . . . Could not ID—would not know them if—I saw them." 13 *id.,* at 2515. Ronquillo's typed summary of this note states that Boatner advised him that he "could not identify any perpetrators of the murder." 5 *id.,* at 817.

Smith is correct that these undisclosed statements could have been used to impeach Boatner and Ronquillo during cross-examination. But the statements are not material for purposes of *Brady* because they cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U. S., at 435. When weighed against the substantial evidence that Boatner had opportunities to view the first perpetrator, offered consistent descriptions of him on multiple occasions, and even identified him as Smith, the undisclosed

statements do not warrant a new trial.

The evidence showed that, notwithstanding Ronquillo's on-scene note, Boatner offered a description of the perpetrator at the scene. Officer Narcisse testified that Boatner provided him with a description of the perpetrator that Boatner saw. Narcisse's testimony thus corroborated Boatner's trial testimony that he saw the first man and described him to police.[3] Narcisse's testimony also mitigated the impeachment value of Ronquillo's on-scene note by indicating that, although Boatner may have provided no detailed description to Ronquillo at the scene, Boatner had described the first man to another officer.[4]

In any event, Ronquillo's notes reflect that Boatner provided a description of the first perpetrator at the police station only a few hours after the shootings occurred. Tr. 403 (Jan. 22, 2009). Boatner was asked if he could "describe the subjects wh[o] shot the people in the house." 5 Record 866. He responded: "I can tell you about one, the one who put the pistol in my face, he was a black male with a low cut, gold[s] in his mouth . . . about my complexion, brown skinned." *Ibid.* When asked, "[Y]ou say you

---

[3] In a pretrial hearing, Boatner testified that he "gave a description to the officer that came to the scene." Tr. 24 (Oct. 27, 1995). Boatner responded negatively when asked whether this officer was Detective Ronquillo. *Ibid.* Boatner further testified that he told the officer that the first man through the door was "heavy built with his hair with a fade, with a little small top with a lot of gold teeth in his mouth." *Ibid.* That testimony was consistent with the testimony that Boatner and Officer Narcisse gave at trial.

[4] Moreover, Boatner's reticence toward Ronquillo at the scene of the crime was entirely understandable. As Ronquillo noted at the postconviction hearing, "there were dead bodies everywhere," and Boatner was "a little shook up." *Id.,* at 402–403 (Jan. 22, 2009). Similarly, Narcisse testified at trial that Boatner, while "not as frantic" as Espadron, was a "bit emotional" when Narcisse encountered him at the scene. *Id.,* at 34 (Dec. 4, 1995).

can't describe any of the other shooters besides the one who put the gun in your face after you opened the door," Boatner replied, "No, I can't." *Ibid.* In his brief, Smith cites this station house statement as an example of favorable, undisclosed evidence. But this statement actually *corroborates* Boatner's trial testimony that he saw and described the first perpetrator to police and that he did not get a good look at the other assailants. Moreover, the description Boatner provided was consistent with Smith's appearance. The Court completely ignores Boatner's station house statement, but our cases instruct us to evaluate "the net effect of the evidence withheld by the State" in assessing materiality. See *Kyles*, *supra*, at 421–422.

The evidence not only shows that Boatner described the first perpetrator twice in the immediate aftermath of the crime, but also that Boatner described him again three weeks later when he viewed a photograph array and eliminated a similar-looking individual. The evidence before the jury further indicated that, several months after the crime, Boatner confidently identified Smith in an array, after evincing a discriminating, careful eye over a 4-month investigative period. What is more, the reliability of Boatner's out-of-court identification was extensively tested during cross-examination at Smith's trial. In particular, Boatner was asked whether the fact that he saw Smith's picture in a newspaper article naming Smith as a suspect had tainted his identification. Boatner did not waiver, responding, "I picked out the person I seen come in that house that held a gun to my head and under my chin and the person that was there when all my friends died." Tr. 190 (Dec. 5, 1995). That Boatner credibly rejected defense counsel's "suggestion" theory is supported by the fact that Boatner did *not* identify cosuspect Robert Trackling— whose photograph was included in a separate array shown to Boatner on the same day that Boatner identified

Smith—even though Trackling's picture was next to Smith's in the same newspaper article. 5 Record 833, 835.

When weighed against Boatner's repeated and consistent descriptions and confident out-of-court and in-court identifications, Boatner's March 6 statement is also immaterial. As an initial matter, Ronquillo's note of his March 6 conversation with Boatner contains an internal contradiction that undercuts its impeachment value. Although the note states that Boatner "didn't see anyone," it also states that Boatner "glanced at 1st one—saw man— through door." 13 *id.,* at 2515. The latter part is consistent with Boatner's repeated statements that he only saw the first man through the door. Moreover, the jury would have evaluated any equivocation in Boatner's statement in light of the fact that he made it a mere five days after a traumatic shooting, when the perpetrators were still at large. The jury would have considered Boatner's trial testimony that, following the murders of his friends, he began having nightmares, had difficulty sleeping, quit his job, and began drinking heavily—so much so that he checked into a hospital for substance abuse treatment and grief counseling. Tr. 162–163, 170–171, 182 (Dec. 5, 1995). Any impeachment value in the March 6 note would have been further mitigated by the fact that, as Ronquillo explained, "on the night of the incident [Boatner] said that he could [identify someone] and he gave a description that was very close to Mr. Smith's description." *Id.,* at 401 (Jan. 22, 2009). And, following his March 6 conversation with Ronquillo, Boatner viewed numerous photograph arrays, described the first perpetrator, and ultimately identified him as Smith.

Of course, had the jury been presented with Ronquillo's notes of Boatner's on-scene and March 6 statements, it might have believed that Boatner could not identify any of the perpetrators, but a *possibility* of a different verdict is insufficient to establish a *Brady* violation. See *Strickler* v.

*Greene*, 527 U. S. 263, 291 (1999); see also *Agurs*, 427 U. S., at 109–110 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Rather, a "petitioner's burden is to establish a reasonable *probability* of a different result." *Strickler*, *supra,* at 291.

Instead of requiring Smith to show a reasonable probability that Boatner's undisclosed statements would have caused the jury to acquit, the Court improperly requires the *State* to show that the jury would have given Boatner's undisclosed statements no weight. See *ante,* at 3 ("[T]he State's argument offers a reason that the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so"). But Smith is not entitled to a new trial simply because the jury could have accorded some weight to Boatner's undisclosed statements. Smith's burden is to show a reasonable probability that the jury would have accorded those statements sufficient weight to alter its verdict. In light of the record as a whole—which the Court declines to consider—Smith has not carried that burden.

## B

Smith also argues that statements by Shelita Russell and Dale Mims documented in Ronquillo's handwritten notes could have been used to impeach Boatner's identification of Smith because the statements indicate that the perpetrators were masked. One undated note, which contains several entries about various aspects of the investigation, states, "female—face down against cabinets—conscious." On the next line, the note continues, "said—in kitchen saw people barge in—one—black cloth across face—first one through door—[no further statement]." 13 Record 2556. When cross-examined during the postconviction hearing about whether this note documented the

statement of Russell, Ronquillo confirmed that the note
was in his handwriting, but he testified that he never
talked to Russell, that he did not know when the note was
made, and that someone else could have relayed the in-
formation to him. Tr. 415–418 (Jan. 22, 2009).[5] I will
assume *arguendo* that, had this note been disclosed, it
would have been admissible at Smith's trial as a dying
declaration of Russell.[6] But the note would have had
minimal impeachment value because, contrary to Smith's
assertions, it is ambiguous in light of the context in which
the statement was made. Officer Narcisse testified that
Russell was conscious and able to talk, but that she was in
"bad condition." *Id.,* at 20 (Dec. 4, 1995). Similarly, Reg-
inald Harbor testified that, as Russell lay wounded, she
was "whining" and he "didn't catch nothing [t]hat she
said." *Id.,* at 205 (Dec. 5, 1995). And, although Smith
contends that the note says "exactly" that the "first person
through the door had a black cloth across his face," that
is not how the note reads. Reply Brief for Petitioner 11
(emphasis deleted; internal quotation marks omitted)
(hereinafter Reply Brief). The note first states that the
declarant "saw people barge in," then states "*one*—black

---

[5] Russell did not make this statement to Officer Narcisse. He testi-
fied that Russell "was not able to give us any information or any details
of what had happened." *Id.,* at 20.

[6] Louisiana law provides that "[a] statement made by a declarant
while believing that his death was imminent, concerning the cause or
circumstances of what he believed to be his impending death[,]" is "not
excluded by the hearsay rule if the declarant is unavailable as a wit-
ness." La. Code Evid. Ann., Art. 804(B)(2) (West Supp. 2012). Assum-
ing this statement was actually Russell's, it likely qualifies as a dying
declaration. At trial, Boatner testified that, in the aftermath of the
shooting, Russell told him, "Feel like I'm about to die." Tr. 161 (Dec. 5,
1995) (internal quotation marks omitted). Espadron also testified that
Russell told her, "I'm gonna die," and, "Don't let me die." *Id.*, at 73–74
(internal quotation marks omitted).

cloth across face—first one through door—[no further statement]." 13 Record 2556 (emphasis added). It is at least as logical to read this statement as indicating only that "one" of the "people" had a "black cloth across [his] face." Russell, suffering from fatal wounds, said nothing further after "first one through door," and it is impossible to know whether the "first one" was also the "one" with a "black cloth across [his] face."

The second statement Smith identifies is that of Dale Mims, who lived down the street from Espadron's home and who heard the shooting. A note by Ronquillo states that Mims saw four males fleeing Espadron's home, "all wearing mask[s]." *Id.,* at 2518. Like Russell's purported statement, this statement has minimal impeachment value in light of the record. Mims' undisclosed statement does not address whether some or all of the perpetrators were masked inside Espadron's home.[7] Moreover, had Mims been called as a witness at trial, he presumably would have testified, as he did at the postconviction hearing, that he was "positive" that he only saw three perpetrators fleeing, and that, of those three, only two were masked. Tr. 269, 271–273, 275 (Jan. 13, 2009).

Both Russell's purported statement and Mims' testimony are consistent with Boatner's testimony that he did not know whether any of the other perpetrators were masked, *id.,* at 154 (Dec. 5, 1995), and with Officer Narcisse's and Espadron's testimony that the single perpetrator whom Espadron observed was wearing some sort of face cover-

―――――――――

[7] Smith ridicules the "exceedingly peculiar" notion that the perpetrators would have remained unmasked inside Espadron's home, only to mask themselves before leaving the scene. Reply Brief 12–13. But that notion is eminently reasonable if the perpetrators intended to massacre the witnesses who were inside the home—as they did—and were concerned only with disguising themselves from neighbors outside who might see or hear the burglary.

ing, *id.,* at 30–31 (Dec. 4, 1995); *id.,* at 71 (Dec. 5, 1995). Thus, the totality of the evidence indicates that some, but not all, of the perpetrators were masked, a conclusion that in no way undermines Boatner's consistent assertions that the only perpetrator *he* saw was unmasked.

C

Smith also contends that Ronquillo's undisclosed note documenting a pretrial statement by firearms examiner Kenneth Leary is material for purposes of *Brady.* The note states that "Leary advised Ronquillo that the 9MM ammunition confiscated from [the scene of the murders] was typed to have been fired from a[n] [Intratec], 'Mac[-] 11' model type, semi automatic weapon." 5 Record 831. According to Smith, this statement conflicts with Leary's trial testimony that the 9-millimeter ammunition found at the scene "was fired by one particular weapon, one 9-millimeter handgun," Tr. 132 (Dec. 5, 1995), because an Intratec or Mac-11 pistol is not a "handgun." Smith further argues that Leary's pretrial statement could have been used to exculpate Smith, whose guilt the prosecution attempted to show by calling a pathologist to testify that Shelita Russell's wounds could have been inflicted by a 9-millimeter "handgun," *id.,* at 39 (Dec. 4, 1995), and by calling Boatner to testify that the gun Smith held under his chin was a 9-millimeter silver "hand gun," *id.,* at 157 (Dec. 5, 1995).

Contrary to Smith's contentions, Leary's pretrial statement does not undermine the evidence presented at trial. Leary's pretrial statement is consistent with his and Boatner's trial testimony because an Intratec or Mac-11 pistol *is* a 9-millimeter handgun. Smith concedes that such a weapon uses 9-millimeter cartridges. Brief for Petitioner 48. Moreover, a "handgun" is simply "[a] firearm that can be used with one hand," American Heritage Dictionary 819 (3d ed. 1992), and no one disputes that an

Intratec or Mac-11 pistol can be used with one hand. Smith nonetheless insists that, "as a colloquial matter, machine pistols of the Intratec or MAC-11 type would be considered automatic or semiautomatic weapons, rather than handguns." Reply Brief 18. But even assuming that Smith is correct, he fails to explain why Leary, a firearms expert, would have been expected to use colloquial rather than technical terminology.[8]

The record also makes clear that, when Boatner used the term "handgun," he did not understand it to exclude automatic or semiautomatic machine pistols. In the immediate aftermath of the murders, as well as at trial, Boatner stated that a second perpetrator carried a "Ma[c] 10" or "Tech Nine" "Uzi" type weapon, Tr. 159, 179 (Dec. 5, 1995); 5 Record 809, 813, 866, and Boatner described that weapon as a "handgun," *id.,* at 809. Moreover, Boatner's pretrial description of the silver or chrome "handgun" that the first man held was consistent with Leary's undisclosed statement that the gun that fired the 9-millimeter ammunition found at the scene was a semiautomatic weapon. In his station house statement, Boatner described the first man's weapon as a "big," "automatic pistol." *Id.,* at 813, 866. Because Leary's pretrial statement is neither impeaching nor exculpatory, Leary's undisclosed statement cannot form the basis of a *Brady* violation. See *Strickler,*

––––––––––

[8] Smith argues that Leary himself considered an "[Intratec] or 'Mac[-] 11'" model type to be different from a 9-millimeter handgun. Smith relies on the fact that Leary's pretrial statement indicated that the ammunition recovered from the scene did not come from the handgun recovered from Donielle Bannister, another suspect in the murders. *Id.,* at 18. Leary's pretrial statement did not describe the handgun recovered from Bannister as a 9-millimeter, contrary to Smith's representation. More importantly, Leary's statement suggests only that *Bannister's* handgun did not fire the 9-millimeter ammunition found at the scene, not that Leary did not consider an "[Intratec] or 'Mac[-]11'" model type to be a handgun.

527 U. S., at 281–282 (To make out a *Brady* viola-
tion, "[t]he evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is
impeaching").

D

Smith next points to purportedly exculpatory and ma-
terial undisclosed pretrial statements made by Robert
Trackling, a member of the "Cut Throat Posse" street gang
with which Smith was allegedly associated, and by Eric
Rogers, an inmate who was incarcerated with Trackling.
5 Record 845. Police notes reflect that Eric Rogers gave an
interview to investigators on May 19, 1995, during which
he described a conversation that he had with Trackling
while in prison. During that conversation, Trackling
described the murders at Espadron's home and stated that
he had committed the crime along with "Fat, Buckle, and
a guy they call uh, Short Dog." *Id.,* at 841. According to
Rogers, Fat's real name was "Darnell [Donielle] Banister,"
Buckle's real name was "Contez [Kintad] Phillips," and
Short Dog's real name was "Juan." *Id.,* at 843–844.

Smith contends that Rogers' interview was exculpatory
in two respects. First, he points to the following comment
by Rogers later during the interview: "They call Contez
Philip Buckle, they call Darnell Banister Fat, Short Dog
that's what they call him, they call Robert Home." *Id.,* at
845. Smith suggests that Rogers' prior identification of
"Short Dog" as "Juan [Smith]" was equivocal in light of his
later statement that "Short Dog" was a man named "Rob-
ert Home." Reply Brief 21. Second, Smith asserts that
disclosure of Rogers' interview would have led the defense
and the jury to learn of Rogers' allegation—made for the
first time 10 years after Smith's trial—that the police had
asked him to implicate Juan Smith as "Short Dog," Tr.
284–285 (Jan. 13, 2009).

Neither argument is persuasive. If the jury had learned

of Rogers' statement, it would have heard information directly *inculpating* Smith as "Short Dog," a perpetrator of the shootings. Rogers' physical description of "Short Dog"—"he['s] short[,] he['s] got golds going across his mouth[,] and . . . he's like built," 5 Record 844–also corroborated Boatner's description of the first man through the door as having a "mouth full of gold" and a "heavy" build. Furthermore, Smith ignores other inculpatory information documented in Ronquillo's notes of Rogers' statement. Those notes reflect Trackling's own interview with police on June 1, 1995, in which Trackling identified Phillips, Bannister, and "Juan Smith" as the perpetrators of the murders at Espadron's home. *Id.,* at 832; see also *id.,* at 854–855. Trackling's statement only strengthens the inculpatory nature of Rogers' interview.

Further, the jury assuredly would not have believed Smith's suggestion that Rogers identified "Short Dog" as a man named "Robert Home." When this statement is taken in context, it appears that Rogers was describing the nickname—"Home"[9]—of Robert Trackling, the "Robert" whom Rogers had repeatedly referenced throughout his interview. See *id.,* at 839–850. Indeed, Rogers' phraseology, "they call Robert *Home*," was consistent with his previous comments that "[t]hey call Contez Philip *Buckle*," and "they call Darnell Banister *Fat*." *Id.,* at 845 (emphasis added). Unsurprisingly, in the thousands of pages of

---

[9] See 2 Dictionary of American Regional English 1064–1065, 1069 (F. Cassidy & J. Hall eds. 1991) (defining "Home" as "a term of address used by two black people either from the same Southern state or simply from the South," similar to "homey" or "home boy"); 2 Green's Dictionary of Slang 828 (2010) (defining "home," an abbreviation of homeboy, as "a friend, often used in direct address"); Concise New Partridge Dictionary of Slang and Unconventional English (T. Dalzell & T. Victor eds. 2008) (defining "home" as "a very close male friend," an abbreviation of "Homeboy").

record material, I have not found, nor have the parties cited, a single reference to anyone named "Robert Home."

If the jury had heard Rogers' postconviction testimony that police asked him to implicate Smith and that Trackling's description of the murders did not include Smith, Tr. 284–285 (Jan. 13, 2009), it would have weighed Rogers' allegation against Trackling's own statement to the police that Smith had participated in the murders at Espadron's home, 5 Record 832. The prosecution also would have called Smith's sister, Trinieze Smith, to testify that she believed her brother was known as "Short Dog," as she did at the postconviction hearing. Tr. 371 (Jan. 14, 2009). On this record, the undisclosed statements by Rogers and Trackling actually strengthen rather than weaken confidence in the jury's guilty verdict.[10]

E

Finally, Smith argues that an undisclosed handwritten note by Ronquillo documenting a statement by Phillip Young—the man found injured at the scene and suspected of having participated in the crime—is also material evidence warranting a new trial. At trial, Ronquillo testified that he met with Young while Young was hospitalized as a result of permanent brain damage suffered in the shoot-

--------

[10] Detective Byron Adams, who took Rogers' statement, did not testify at the postconviction hearing because he had died in the meantime. He thus had no opportunity to address Rogers' recantation or his newly minted allegation that Detective Adams asked Rogers to implicate Smith. Smith argues that "there is no reason to believe that . . . Adams would have contradicted Rogers—much less that the jury would have believed [him] if [he] did." Reply Brief 21. But Smith offers no support for his dubious assertion that Detective Adams would have admitted to framing Smith, or that, had the detective denied the allegation, the jury would have believed Rogers—a convicted murderer who never explained any motive Adams would have had to frame Smith—over the detective.

ings. *Id.,* at 102 (Dec. 5, 1995). According to Ronquillo, Young "was strapped to a chair. He really couldn't talk, [h]e mumbled. He could use his left hand, that was all. He couldn't walk or anything. He was fed through a tube by the people there. He was in really bad shape." *Id.,* at 102–103. When asked whether Young was able to communicate with him "at all," Ronquillo responded, "No. I couldn't understand anything that he was saying." *Id.,* at 103.

The undisclosed note from Ronquillo's meeting with Young reads as follows: "Short Dog/Bucko/Fats—No—Didn't shoot me—No—Not with me when went to house—Yes—one of people in house shot me—No—Not responsible—'Posse'—Didn't drive to house—'Posse'—Yes—Knows names of perps—Yes—Drove in car—Yes—girlfriend's car." 13 Record 2568. Smith contends that this note is exculpatory in that it suggests that he was "not involved" in the shootings. Brief for Petitioner 43.

Young's statement is only exculpatory if Smith concedes (as the statement asserts) that he is, in fact, "Short Dog" and a member of the "Cut Throat Posse." Such a concession would only have strengthened the inculpatory value of the statements by Rogers and Trackling indicating that Smith was the "Short Dog" who committed the murders at Espadron's home. In any event, the exculpatory value of the note is minimal for several other reasons. First, it is unclear whether Ronquillo's note reflects a statement by Young that the "Posse" was not responsible for shooting the victims or a statement that the "Posse" was not responsible for shooting *Young.* Further, the statement that "Short Dog" and others were not with Young when he *went to the house* is certainly not a clear statement that "Short Dog" did not commit the murders, especially in light of evidence in the record that the assailants used two cars on

the night of the murders.[11]  Second, had the jury learned
of Ronquillo's note, it would have presumably heard Ron-
quillo testify, as he did at the postconviction hearing, that
he was not even sure whether his note actually reflected
statements by Young, given that Young "couldn't talk,"
was "jumbled," could only "kind of move his head," and
sometimes would just sit and stare when Ronquillo asked
a question.[12]  Tr. 423–424 (Jan. 22, 2009).  Accordingly,
Ronquillo explained, "I never had hide nor hair actually of
what [Young] said."  *Id.,* at 423.

  The jury thus would have evaluated Ronquillo's note, of
unclear exculpatory value on its face, against a backdrop
of doubt as to what, if anything, Young actually communi-
cated.  The jury also would have weighed this evidence
against the strongly inculpatory nature of Boatner's de-
scriptions and identifications and Rogers' and Trackling's
statements, which corroborated Boatner's identification.
When all of the evidence is considered cumulatively, as it
must be, Smith has not shown a reasonable probability
that the jury would have reached a different verdict.

––––––––––

  [11] In his station house statement, Boatner explained that the loud car
that arrived at Espadron's home was white.  5 Record 866.  In Rogers'
interview with the police, Rogers said that Trackling escaped from
Espadron's home in a burgundy car.  *Id.,* at 842.

  [12] Smith also contends that the defense could have used the undis-
closed note to impeach Ronquillo's trial testimony that Young was not
able to communicate with him "at all."  That argument lacks merit.
Ronquillo's trial testimony, when read in context, does not suggest that
no communication occurred.  Rather, Ronquillo made clear that he
simply "couldn't understand anything that [Young] was *saying.*" See Tr.
103 (Dec. 5, 1995) (emphasis added).  That testimony is consistent with
the garbled nature of the note, and the note thus would have had little,
if any, impeachment value.

THOMAS, J., dissenting

\*     \*     \*

The question presented here is not whether a prudent prosecutor should have disclosed the information that Smith identifies. Rather, the question is whether the cumulative effect of the disclosed and undisclosed evidence in Smith's case "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U. S., at 435. When, as in this case, the Court departs from its usual practice of declining to review alleged misapplications of settled law to particular facts, *id.,* at 456 (SCALIA, J., joined by Rehnquist, C. J., and KENNEDY and THOMAS, JJ., dissenting), the Court should at least consider all of the facts. And, the Court certainly should not decline to review all of the facts on the assumption that the remainder of the record would only further *support* Smith's claims, as the Court appears to have done here. *Ante,* at 3–4.

Such an assumption is incorrect. Here, much of the record evidence confirms that, from the night of the murders through trial, Boatner consistently described—with one understandable exception—the first perpetrator through the door, that Boatner's description matched Smith, and that Boatner made strong out-of-court and in-court identifications implicating Smith. Some of the undisclosed evidence cited by Smith is not favorable to him at all, either because it is of no impeachment or exculpatory value or because it actually inculpates him. Because what remains is evidence of such minimal impeachment and exculpatory value as to be immaterial in light of the whole record, I must dissent from the Court's holding that the State violated *Brady*.